

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00620-CR

Carlton Leroy **ZIMMERMAN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 8, Bexar County, Texas
Trial Court No. CC678082
Honorable Brenda Chapman, Judge Presiding

Opinion by:     Lori I. Valenzuela, Justice

Sitting:         Patricia O. Alvarez, Justice
                 Liza A. Rodriguez, Justice
                 Lori I. Valenzuela, Justice

Delivered and Filed: August 16, 2023

AFFIRMED

Following a bench trial, the court found appellant, Carlton Leroy Zimmerman, guilty of indecent exposure and assessed punishment at a fine and 180-days in jail probated for twenty-four months. In a single issue on appeal, Zimmerman challenges the legal sufficiency of the evidence in support of the conviction. We affirm.

## BACKGROUND

Brenda Garza testified her house is two houses away from Zimmerman's house, and he is the neighborhood handyman. The house in between belongs to Jorge Olivares. Garza said that,

on the afternoon of May 25, 2021, she was outside with her wife and six-year-old daughter. Garza and her wife sat in a hammock under a canopy, while their daughter swam in their pool. The canopy was tilted in a way that prevented neighbors from seeing them and they were sitting with their backs to the fence between their property and Olivares's property.

At some point, she noticed her daughter looking at the corner of Olivares's fence, which she described as having horizontal boards through which one could see into Olivares's backyard. When her daughter said, "Mom, I'm ready to go inside," Garza looked in the same direction as her daughter and saw "movement" between the spaces in the fence. At first, she could see only Zimmerman's head and that he was "kind of hunched sitting down." Garza went to the fence, stepped up on a piece of wood, and looked over the fence. Garza stated Zimmerman had his penis in his hand, he was moving his hand up and down, and when she looked over the fence, "he pushed it between his legs and kind of leaned forward." She said Zimmerman was not wearing any clothes and his "very short shorts" were next to him. She said she told Zimmerman, "We are going to have a problem," and he replied, "No, we're not" and "Let's not worry about the $200 that you were going to give me for the tree that I was cutting."

Garza said she measured the distance from her pool to the fence at forty-four feet and she knew the person she saw was Zimmerman even at that distance because she recognized his hair. She stated she was familiar with the layout of Olivares's yard because he was her wife's cousin. She said that from the street in front of Olivares's house, people can see the part of the backyard where Zimmerman sat, and there are houses along the shared alley.

Garza testified she was on the telephone with the police dispatcher while she confronted Zimmerman. She said she called the police "when [she] knew he was masturbating," and, by the time they arrived, Zimmerman had already put on his shorts and returned to his own house. Garza admitted she did not actually see Zimmerman masturbating and that she saw only "movement."

She also admitted that the first time she saw Zimmerman sitting down was when she stepped up on the piece of wood to look over the fence. When asked how she knew Zimmerman was masturbating, she replied,

> He had his hands on his penis. He was in the middle of stroking himself. And when I popped up, like as soon as I popped up, saw that, he went down, and put his penis in between his legs. And then we had a conversation throughout that time.

San Antonio Police Department Detective Wessley Ross testified he contacted Garza who provided a statement. He also contacted Zimmerman who came in for an interview. Ross said Zimmerman told him the following:

> He admitted that he was at the location. He lives next door on the other side of the [Olivares] property. He is a caretaker for the property while he was [sic] there. He was in the back. He said – if I remember correctly that he had a – he urinated [in] his shorts. He was wearing shorts at the time, and he took them off and he urinated in the corner of the back of the [Olivares] property.

Ross said that at the time of the interview, he had not yet watched surveillance videos taken from cameras on Olivares's property. After he watched the surveillance videos, he concluded Zimmerman had misled him during their interview because Zimmerman told him he went to the corner of the yard and removed his shorts to urinate, but in the video he "was already naked when he went across the back of the yard, because his shorts was [sic] in his hand. When he went into the corner there, he's already exposed." On cross-examination, Ross admitted he could not say Zimmerman lied when he said he was urinating. He also admitted the incident occurred in the backyard of a private residence.

The State introduced into evidence and played for the trial court two surveillance videos taken from a camera mounted on Olivares's roof[1] and the video of the interview between Ross and Zimmerman at the police station. The Olivares camera pointed down a cement driveway/patio

---

[1] The surveillance videos do not contain sound.

area.  Visible at the far end of the cement area is a fence along the alley.  The fence line between Olivares's and Garza's property runs along the left side of the cement area.  A vehicle is parked to the left (next to the fence on the left shared by Olivares and Garza) and some bins and other objects are to the right.  The vehicle is pointed in the direction of the alley.  All fences shown in the video are slatted and can be seen through.



The first surveillance video shows Zimmerman walking along the right side of the cement area and he is wearing only his shorts.  For a brief moment he is out of sight behind the bins and other objects.  He then walks back into view, along the alleyway fence line in the direction of the fence between Olivares's and Garza's property.  This time it appears he is carrying his shorts.  For the remainder of the video, he is between the fence and the vehicle and, therefore, not visible.  The video is not clear enough to determine whether Zimmerman was naked or holding his penis.

The second surveillance video, a continuation of the first, shows Zimmerman step out from behind the vehicle and approach the fence along Garza's property line.  He can be seen either crouched down or sitting, appearing to be looking through the wood slats in the fence.  He is still carrying his shorts, but his lower body cannot be seen because he is behind planters.  The video then shows Garza appear at the top of the fence speaking with Zimmerman, Garza moving out of frame, and Zimmerman putting on his shorts.

The third video shows the interview at the police station,[2] at which time Ross had not yet viewed the surveillance videos. Zimmerman told Ross a tree on someone else's property had fallen during a storm, the tree fell on a shed on Garza's property, and he took it upon himself to cut back the branches on Garza's shed. A few days later, he moved the tree logs to the alley for brush pickup. On the day of the incident, he tried to repair Garza's shed and he wore only his shorts. He told Ross that, at some point, he went back to the corner of the fence along Garza's property, and removed his shorts because he had to urinate. He said he was not aware of his surroundings, he relieved himself, and "the next thing [he] knew" he saw a girl walking towards the fence. He said he then tried to hide himself, Garza told him "it's going to be a problem," he replied that he was hot and that he had just urinated. He told Ross he tried to put his shorts back on while Garza accused him of masturbating, shouted profanities at him, and said she wanted to jump the fence and beat him up. Because of what Garza was saying to him, he "took off." He said he knew Garza was on the phone with the police, so he went home, changed clothes, composed himself, and waited for an officer to arrive. He told Ross that when the officer arrived, he was questioned, and told to stay away and mind his own business. He said he does not expose himself because he has a deformity and a double hernia.

## STANDARD OF REVIEW & APPLICABLE LAW

In reviewing a legal sufficiency claim, we look at the evidence in the light most favorable to the verdict. *Romano v. State*, 610 S.W.3d 30, 34 (Tex. Crim. App. 2020) (citing to *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard applies whether the case was proven by direct or circumstantial evidence." *Id.* We must defer to the fact-finder's findings and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable

---

[2] The sound on this video starts and stops; therefore, the entirety of the interview cannot be heard.

doubt. *Id.* The fact-finder is responsible for judging the credibility of the witnesses and may find credible all, some, or none of the testimony given by the witnesses. *Id.*

The offense of indecent exposure occurs when a person "exposes . . . any part of his genitals with intent to arouse or gratify the sexual desire of any person, and he is reckless about whether another is present who will be offended or alarmed by his act." TEX. PEN. CODE § 21.08(a). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* The issue is whether a defendant was reckless about whether another person was present who would be offended, not whether the other person was offended. *Hefner v. State*, 934 S.W.2d 855, 857 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd).

### ANALYSIS

On appeal, Zimmerman raises the following arguments that the evidence was legally insufficient: (1) he did not expose his penis, (2) he had no intent to arouse, (3) he was not in a public place, and (4) he was not reckless about another person being present.

### A. Exposure of Genitals

Zimmerman asserts he did not expose his genitals because, instead of laying his penis open to view, he took several measures to shield himself from being seen—he was crouched down behind a fence and when Garza walked forty-four feet to the fence and raised herself up to look over the fence, he immediately hid his penis.

"The statute under which [Zimmerman] was charged . . . is based on the accused's actions and mental state, not the victim's comprehension." *Metts v. State*, 22 S.W.3d 544, 547 (Tex.

App.—Fort Worth 2000, pet. ref'd). The State is not required to prove that the defendant exposed himself to the complainant or that another person was present because such a requirement would increase the State's burden of proof beyond what is required by section 21.08. *See Swire v. State*, 997 S.W.2d 370, 373 (Tex. App.—Beaumont 1999, no pet.) (holding conviction would stand even without proof that Swire exposed himself to Mrs. Roy or that another person was present); *McGee*, 804 S.W.2d at 547 (conviction would stand even without proof that defendant exposed himself to store manager). "Thus, the State is only required to prove that appellant's genitals were exposed." *Metts*, 22 S.W.3d at 547 (concluding witness's testimony that appellant was naked from the waist down, that he appeared to be masturbating, and that he continued to stare at her as he did so was circumstantial evidence that appellant exposed his genitals).

In *McGee v. State*, 804 S.W.2d 546 (Tex. App.—Houston [14th Dist.] 1991, no pet.), the store manager, Eric Rinkoff, noticed McGee was in a dressing room an unusually long time and there were several customers waiting to use the rooms. Rinkoff testified McGee's pants and both garments he took into the dressing room were lying on the floor. He also saw, through the gap under the curtain, that McGee was facing the rear of the dressing room, alternatively shifting back and forth between each corner with his toes curled. Becoming suspicious, Rinkoff walked up to the room and looked through a three- or four-inch gap in the curtain. Rinkoff saw McGee standing in the rear corner looking through a grommet hole into the next room where a woman was trying on a bathing suit. McGee's underwear was pulled down on one side and he was masturbating as he watched the woman. 804 S.W.2d at 546-47.

On appeal, McGee asserted the evidence was insufficient to prove he exposed himself. He argued there was a difference between alleging a person exposed his genitals "to" another person and merely alleging that a person exposed his genitals. The court of appeals considered this "a meritless exercise in semantics." *Id.* at 547. Because there is no statutory definition of the word

"expose," the court held the word should be given its ordinary meaning, which, in "common parlance," "is defined as to lay open to view." *Id.*[3] (citation omitted). The court noted there was a three- or four-inch gap in the dressing room's curtain through which Rinkoff saw McGee masturbating. *Id.* The court held that "[t]he State was not required to prove that [McGee] intended for Mr. Rinkoff to see his genitals, merely that [McGee's] genitals were open to view." *Id.* The court concluded there was sufficient evidence for a rational trier of fact to find that McGee's genitals were exposed to view and that they were seen by Rinkoff. *Id.*

Here, both Garza and Ross testified Zimmerman's penis was exposed. Therefore, whether Zimmerman attempted to hide his penis is not relevant. We conclude there was sufficient evidence for a rational fact-finder to find that Zimmerman's genitals were exposed to view and that they were seen by Garza.

## B.     Intent to Arouse

Zimmerman contends evidence of him masturbating was merely speculative because Garza testified she did not see him masturbating, she only saw "movement," and he was holding his penis because he was urinating. He argues the speculative testimony that he was masturbating was legally insufficient to support this element of the offense.

The State must show a defendant acted "with intent to arouse or gratify the sexual desire of any person." TEX. PEN. CODE § 21.08(a). The statute does not require a defendant to intend that his exposure to the other party result in his sexual gratification. *Asemota v. State*, 996 S.W.2d 322, 323-24 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (citing TEX. PEN. CODE § 21.08)

---

[3] *But see Morales v. State*, No. 05-98-00255-CR, 1999 WL 185034, at *2 (Tex. App.—Dallas Apr. 6, 1999, pet. ref'd) (mem. op.) (disagreeing with *McGee*'s definition and holding "section 21.08 should not be so limited. Proof of exposure may be either direct or circumstantial probative evidence that a given defendant was in fact engaged in exposing his genitals with the intent to gratify his sexual desire and was reckless about whether another was present who would be alarmed or offended by his act.").

(concluding "appellant misinterpreted the statute because the statute does not require the State prove appellant intended his *exposure* to complainant to satisfy or gratify his own sexual desire"). "Indecent exposure, therefore, merely requires appellant actually expose himself while intending to arouse or gratify his or another's sexual desire and be reckless about whether another is present." *Id.* at 323.

"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "In such cases, it is not necessary that every fact and circumstance 'point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.'" *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) (citation omitted). "Furthermore, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence." *Id.*

Garza saw Zimmerman nude, holding his penis with his hand, "going in an up and down motion," "in the middle of stroking himself." The video showed Zimmerman nude and looking through the gaps of the fence into Garza's yard. A reasonable fact-finder could have made a common-sense inference that Zimmerman was masturbating and, therefore, arousing or gratifying his own sexual desire. Although Zimmerman claimed he was merely urinating, it was the fact-finder's prerogative to not believe him and resolve conflicts in the evidence, and we defer to that determination. We conclude there was sufficient evidence for a rational fact-finder to infer Zimmerman acted with intent to arouse or gratify his sexual desire.

## C.    Public Place & Reckless About Another Person Being Present

The information alleged, in part, that Zimmerman "was reckless about whether another was present who would be offended and alarmed by such act in that such act was committed in a

public place." On appeal, Zimmerman first asserts he was not in a public place because he was in the backyard of a private residence. He also contends that because the State charged him with committing this offense in a public place, it was required to prove that issue beyond a reasonable doubt. We disagree.

"Section 21.08 does not expressly require that the State prove [Zimmerman] exposed himself in a public place; it merely requires the State to prove he recklessly exposed himself to another." *Young v. State*, 976 S.W.2d 771, 774 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd); *see also Morales v. State*, No. 05-98-00255-CR, 1999 WL 185034, at *4 (Tex. App.—Dallas Apr. 6, 1999, pet. ref'd) (not designated for publication) (appellant could be seen publicly from where he was positioned);[4] *Alpine v. State*, No. C14-89-00036-CR, 1989 WL 97748, at *2 (Tex. App.—Houston [14th Dist.] Aug. 24, 1989, no pet.) (not designated for publication) ("Proper pleading in indecent exposure cases requires an averment that the offense transpired in either a public or semi-public place under circumstances which show that the accused was aware of the risk that another person was present who would be offended by his act yet proceeded in conscious disregard of the risk.").

The allegation that Zimmerman committed the offense in a public place is a component of the allegation that he acted recklessly. *See State v. York*, 31 S.W.3d 798, 802 (Tex. App.—Dallas 2000, pet. ref'd) ("By alleging that York exposed his penis at a public park, the State alleged circumstances indicating York was aware of the risk that another person was present who would be offended by his act of exposing himself and that he acted in conscious disregard of that risk.").

---

[4] In *Morales*, although there was no trial testimony that the incident occurred "in public" or "in a public place," the complainant saw appellant look through a neighbor's front windows, then lay down and masturbate while laying down in front of the neighbor's side window. The complainant also testified appellant was fully exposed to public view. The neighbor testified that the area in front of his house and the area on the side of his house adjacent to his bedroom are exposed to public view. Also, another neighbor testified that one can see between the houses from the street. The court held, "[a]ppellant was not in a place where he had any expectation of privacy. He was in an area visible from the street and exposed to public view." *Id.* at *4.

Although "in public" is not defined, the Texas Penal Code defines "public place" as "any place to which the public or a substantial group of the public has access . . . ." TEX. PEN. CODE § 1.07(40). The Court of Criminal Appeals has held that "[i]t is the persons who can and do see the exhibition rather than the place where the exhibition is made which controls under the statute." *Campbell v. State*, 169 Tex. Crim. 515, 517, 338 S.W.2d 255, 257 (1960). In *Campbell*, a County sheriff learned about a group of people who participated in a health club where several families gathered on weekends to play games in the nude. *Id.* at 256. The camp was operated by the appellant and his wife on a tract of land owned by the appellant. The sheriff and other officers viewed a group of people at the camp participating in activities in the nude. The officers' vantage point was about a hundred yards from some buildings at the appellant's camp; the officers were not on the appellant's property. *Id.* The Court agreed with the charge definition of the term "in public" as having "reference to persons who do or can see the act rather than to the place where the act is committed." *Id.* at 257. Therefore, the issue here is whether Zimmerman was reckless about whether another person was present who would be offended or alarmed by his act. *See* TEX. PEN. CODE § 21.08(a).

Zimmerman asserts he was not reckless about another person being present. He contends no one was present when he had his shorts off in the backyard of a private residence, behind a fence, forty-four feet away from anyone, and in an area that was not open. He does not deny the allegations that he was not wearing his shorts or that his penis was out.

"By its nature, a culpable mental state must generally be inferred from the circumstances." *Romano*, 610 S.W.3d at 35. "We cannot read an accused's mind, and absent a confession, we must infer his mental state from his acts, words and conduct." *Id.* "Reviewing the sufficiency of the evidence of recklessness, the question before us . . . is whether, after viewing all the evidence in

the light most favorable to the verdict, any rational finder of fact would have found beyond a reasonable doubt that Appellant acted recklessly." *Id.*

In *McGee*, McGee argued the evidence was insufficient to prove recklessness because his actions did not constitute a gross deviation of the standard of care of an ordinary person under the circumstances because he attempted to close the curtain in the dressing room and other witnesses testified it was difficult to close the curtains to the dressing rooms. 804 S.W.2d at 548. The court of appeals stated McGee's argument "misconstrue[d] the offense." *Id.* "The State was not required to show that [McGee] recklessly used a dressing room." *Id.* "Rather, it was required to prove that [McGee's] *conduct* in the dressing room was reckless." *Id.* (emphasis in original). "Indeed, the issue as stated is oxymoronic in nature. Under the circumstances as viewed from [McGee's] standpoint, it appears that there was a substantial risk that someone could have witnessed his actions." *Id.* The court concluded the evidence was sufficient to sustain the finding that McGee "was reckless because another person was present who was offended or alarmed by [McGee's] act of masturbation." *Id.*

In *Romano*, Romano exposed his genitals in broad daylight in a public parking lot in a public park in Houston. The question on appeal was whether the evidence was sufficient to show that he was reckless as to the presence of another. The court of appeals determined Romano "made deliberate efforts to shield himself from the view of others" and that he "was unaware that Gardiner [a police officer] was hiding a good distance away in the trees and bushes." 610 S.W.3d at 33. Based on what the court of appeals considered to be "undisputed, objective evidence," it concluded a rational trier of fact could not have found beyond a reasonable doubt that Romano was reckless about whether another was present who would be offended or alarmed by the exposure of his genitals. *Id.*

The Court of Criminal Appeals criticized the court of appeals because, "[r]ather than view the evidence in the light most favorable to the verdict, the court of appeals focused on [Romano's] purported attempt to conceal himself by parking in an empty lot, his testimony that he faced away from passing traffic, and his testimony that no one was nearby." *Id.* at 36. The Court took note of the police officer's testimony that Romano "stood at the back of the car to masturbate, and the trial court did not have to believe that the area was remote." The Court also noted the officer's body camera video that showed a number of cars driving past Romano's location, pedestrians walking by, a cyclist passing on the trail during the arrest, and another car passing on the road behind Romano's parked vehicle less than twenty seconds before the officer radioed his partner that he observed Romano masturbating. *Id.* The Court concluded Romano's "location, the time of day, and the clear weather provide[d] sufficient evidence for a rational finder of fact to infer recklessness." *Id.*

Here, although the distance from Garza's pool to the fence she shared with Olivares was forty-four feet, the video clearly shows Zimmerman either crouching or sitting next to the fence, which was made of slats that allowed one to see through the fence. Zimmerman knew Garza, her wife, and young daughter lived at the house. Garza also testified the area in which Zimmerman was located was visible from the street. Although Zimmerman said he was not aware of his surroundings, it was the fact-finder's prerogative to not believe him and to infer he knew the Garza family was in their backyard. We conclude there was sufficient evidence for a rational fact-finder to infer recklessness.

## CONCLUSION

We overrule Zimmerman's issue on appeal and affirm the trial court's judgment.

Lori I. Valenzuela, Justice

Do not publish